```
                IN THE DISTRICT COURT OF THE UNITED STATES
                FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                            STATESVILLE DIVISION
                                 5:05cv276
```

| | |
|---|---|
| DANIELLE ANNA McMILLIAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | MEMORANDUM |
| ) | OF DECISION |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the court pursuant to 28, United States Code, Section 636(c) and upon plaintiff's Motion for Summary Judgment[1] and the Commissioner's Motion for Summary Judgment. Having carefully considered such motions and reviewed the pleadings, the court enters the following findings and conclusions. A judgment reflecting such conclusions is being entered simultaneously herewith.

## FINDINGS AND CONCLUSIONS

**I.     Administrative History**

---

[1] Plaintiff has referenced Rule 12(c) in her motion, which appears to be a clerical error.

**1**

Plaintiff filed an application for a period of disability and Childhood Disability Insurance Benefits. Plaintiff's claim was denied both initially and on reconsideration; thereafter, plaintiff requested and was granted a hearing before an administrative law judge ("ALJ"). After conducting a hearing, the ALJ issued a decision which was unfavorable to plaintiff, from which plaintiff appealed to the Appeals Council. Plaintiff's request for review was denied and the ALJ's decision affirmed by the Appeals Council, making the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner"). Thereafter, plaintiff timely filed this action.

## II.     Factual Background

It appearing that the ALJ's findings of fact are supported by substantial evidence, the undersigned adopts and incorporates such findings herein as if fully set forth. Such findings are referenced in the substantive discussion which follows.

## III.    Standard of Review

The only issues on review are whether the Commissioner applied the correct legal standards and whether the Commissioner's decision is supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Review by a federal court is not *de novo*, Smith v. Schwieker, 795 F.2d 343, 345 (4th Cir. 1986); rather, inquiry is limited to whether there was "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion," Richardson v. Perales, supra. Even if the undersigned were to find that a preponderance of the evidence weighed against the Commissioner's decision, the Commissioner's decision would have to be affirmed if supported by substantial evidence. Hays v. Sullivan, supra.

## IV. Standard for Evaluating Allegations of Pain and Other Subjective Complaints

Plaintiff's claim for benefits includes allegations of pain or other subjective complaints. The correct standard and method for evaluating claims of pain and other subjective symptoms in the Fourth Circuit has developed from the Court of Appeals' decision in Hyatt v. Sullivan, 899 F.2d 329 (4th Cir. 1990)(Hyatt III), which held that " [b]ecause pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative." Id., at 336. A two-step process for evaluating subjective complaint was developed by the appellate court in Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996), and is now reflected in Social Security Ruling 96-7p.[2]

---

[2]

"The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision." S.S.R. 96-7p (statement of purpose).

Craig requires that the Commissioner apply a two-step analysis when assessing the credibility of a claimant's subjective complaints of pain. See 20 C.F.R. § 416.929. In conducting the two-step Craig analysis, Step One requires the ALJ to determine whether there is "objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant" Craig, at 594. Once a medical impairment is identified by the ALJ in Step One that could reasonably be expected to produce the pain or other subjective complaint asserted, the intensity and persistence of that pain is evaluated by the ALJ along with the extent to which such pain or other subjective complaint limits claimant's ability to engage in work. Id.; see also 20 C.F.R. § 416.929(c).

Once the ALJ progresses to Step Two, he or she considers the following factors, which include: (1) plaintiff's testimony and other statements concerning pain or other subjective complaints; (2) plaintiff's medical history; (3) any laboratory findings; (4) objective medical evidence of pain if any; (5) the plaintiff's activities of daily living; and (6) any course of treatment the plaintiff has undergone to alleviate pain. Craig, supra, at 595.

## V. Substantial Evidence

### A. Introduction

The court has read the transcript of plaintiff's administrative hearing, closely read the decision of the ALJ, and reviewed the extensive exhibits contained in the administrative record. The issue is not whether a court might have reached a different conclusion had he been presented with the same testimony and evidentiary materials, but whether the decision of the administrative law judge is supported by substantial evidence. The undersigned finds that it is.

### B. Sequential Evaluation

Under the Social Security Act, a child of person who is entitled to old-age or disability insurance benefits (such as plaintiff's deceased father) may apply for and obtain such benefits, even where that person is no longer a child, if the claimant is unmarried and is under a disability (as defined by Section 223(d) of the Act) which began before she reached the age of 22 years. Plaintiff meets such threshold requirement and review of her claim is conducted under the familiar five-step sequential evaluation process.

A five-step process, known as "sequential" review, is used by the Commissioner in determining whether a Social Security claimant is disabled. The

Commissioner evaluates a disability claim under Title II pursuant to the following five-step analysis:

a. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings;

b. An individual who does not have a "severe impairment" will not be found to be disabled;

c. If an individual is not working and is suffering from a severe impairment that meets the durational requirement and that "meets or equals a listed impairment in Appendix 1" of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors;

d. If, upon determining residual functional capacity, the Commissioner finds that an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made;

e. If an individual's residual functional capacity precludes the performance of past work, other factors including age, education, and past work experience, must be considered to determine if other work can be performed.

20 C.F.R. 404.1520(b)-(f). In this case, the Commissioner determined plaintiff's claim at the fifth step of the sequential evaluation process.

### C. The Administrative Decision

While plaintiff has alleged the onset of disability since birth in 1983, the ALJ found that the administrative record in this case begins in October 2000, when plaintiff presented at a hospital after allegedly suffering a seizure at her home. A.R.,

at 17. The first hearing conducted by the ALJ on April 19, 2004, was adjourned to allow plaintiff an opportunity to obtain counsel and develop the medical record. A.R., at 243-76. By the time of the second hearing, on October 18, 2004, plaintiff had submitted her medical records and was represented by an attorney. A.R., at 15, 277-331. In addition, a consultative psychological examination was obtained by the Commissioner. A.R., at 21&169.

At the fifth step of the sequential evaluation process, the ALJ determined that plaintiff had no past relevant work experience, that she had the residual functional capacity to perform a significant range of heavy work, that she was a younger individual, and that she had a limited education. A.R., at 25. Based on such findings, the ALJ applied Medical-Vocational Rule 204.00 as a framework for decision making, and determined that there were a significant number of jobs that plaintiff could perform in the national economy, and was not under a disability as defined by the Social Security Act. Id.

### D. Discussion

#### 1. Plaintiff's Assignment of Error

Plaintiff has made the following assignment of error: the ALJ erred by improperly evaluating the opinion of Dr. Padgett, a consulting physician. Plaintiff's assignment of error will be discussed below.

## 2. Nature of Plaintiff's Claim

When plaintiff was age 17, plaintiff's father, a fully insured wage earner, died, leaving as survivor plaintiff. A.R., at 16 & 20. At the time of her father's death, plaintiff began receiving Social Security survivor benefits. Plaintiff is now applying for benefits on her own record, contending that she has been disabled from birth in August 1983. A.R., at 16.

At the hearing, plaintiff testified that she and her mother lived in Section 8 housing on her mother's supplemental security income of $564 and food stamps, and that her own Medicaid had recently expired. A.R., at 20. She testified that she is 5'9" tall and weighs 200 pounds, that she sleeps the day away, and experiences seizures approximately every two days either while sleeping or upon waking. Id. She testified that she left school in the eighth grade because she was not receiving help with her school work. Plaintiff has friends, who like her dress in "goth" style, but that she does not see her friends frequently because she cannot afford the gas. Id. She testified that she has never worked, but has looked for work at department stores and fast food restaurants. Id. Plaintiff testified that she is unable to work due to being unable to complete her GED, which she said was due to her own frustration. Id.

As to daily activities, and in addition to sleeping all day, plaintiff testified that she cleans up after her disabled mother, takes care of the family's five pets, cooks

8

food, does the laundry, watches television, reads fiction, and uses the computer to write. Id. Plaintiff has written a number of stories and poetry that have never been published. A.R., at 171. For recreation, plaintiff visits a fraternal lodge nearby and plays bingo or cards. A.R., at 20-21. In statements made to mental health providers, plaintiff stated she aspired to be a professional wrestler. A.R., at 192.

After conducting an extensive review of all the evidence, the ALJ concluded that plaintiff suffers from a seizure disorder which is controlled with prescription medication and an adjustment disorder with mixed features. At the second and third steps of the sequential evaluation process, the ALJ determined that these impairments were "severe" as provided by 20 C.F.R. § 404.335(b)(2). A.R., at 24. As discussed above, the ALJ then determined that plaintiff had the RFC for heavy work, but was limited in that she could work at heights, around dangerous machines or hazards, could not drive, and was limited to non-production work with minimal interpersonal contact.

### 3. Discussion of Assignment of Error

#### a. Discounting Dr. Padgett's Opinion

The first element of plaintiff's assignment of error is that the ALJ improperly discounted the opinion of Dr. Padgett, a consulting physician, through improper reliance on the opinion of Dr. Stone. Pl. Br., at 3-10.

First, the court will consider Dr. Padgett's opinion. On July 6, 2004, Dr. Padgett tested the plaintiff and found that plaintiff had low average intelligence, a high school reading level, Memory Indexes between 76 and 112 and a diagnosis of Bipolar II Disorder. A.R., at 173. He also found that plaintiff was able to understand, retain and follow instructions; however, she had difficulty sustaining attention, relating to others and responding to the stress and pressure of day to day work activities. A.R., at 173-174.

On July 13, 2004, Dr. Padgett completed a Medical Source Statement in which he concluded that while plaintiff only had slight limitations in her ability to understand, remember, and carry out simple instructions, she had moderate restrictions in her ability to understand, remember and carry out detailed instructions; make judgments on simple work-related decisions; interact with the public, supervisors and coworkers and respond appropriately to work pressure and changes in routine work settings (moderate to marked). A.R., at 178-179.

In his consideration of plaintiff's claim, the ALJ referenced Dr. Padgett's assessments in her administrative decision and then explained why she was not completely adopting the doctor's conclusions into her RFC determination. A.R., at 21-22. In so doing, the ALJ ably complied with her obligation of explanation. The ALJ initially noted that Dr. Padgett's diagnosis of Bipolar II Disorder was not

consistent with plaintiff's MMPI results, because, while the testing revealed that plaintiff had identity problems and hyperactivity, it failed to establish that she had severe mood swings. A.R., at 21. The ALJ also noted that inconsistent with such diagnosis, plaintiff's psychological records failed to demonstrate that she had suffered at least one episode of major depression as the medical notes from Crossroads[3] only indicated that she had an adjustment disorder with mixed disturbance of emotions. A.R., at 21. The ALJ further noted that Dr. Padgett's assumptions concerning plaintiff's inability to sustain concentration and follow instructions were at odds with plaintiff's testing performance as her memory testing was in the normal range. A.R., at 21. The ALJ added that plaintiff's reported hobbies of writing, drawing and reading were not activities that an individual with a severe memory deficit could perform, and to extent that she attempted to minimize her participation in those activities, her testimony was not credible. A.R., at 21. The ALJ did, however, conclude that plaintiff's ability to deal with stress was limited and she had difficulty with extensive social interaction, and these restrictions were incorporated into the RFC determination. A.R., at 21.

---

[3] Plaintiff was receiving psychotherapy for her mental ailments at such facility.

Plaintiff claims that the ALJ's evaluation of Dr. Padgett's opinion was flawed because the ALJ used Dr. Stone's assessment to discount the consulting physician's conclusions. Pl. Br., at 8-9. Dr. Stone is psychiatrist who treated the plaintiff at Cornerstone. Review of the ALJ's discussion and decision reveals, however, that the ALJ did not discount Dr. Padgett's opinion. Dr. Padgett determined that plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions; interact with the public, supervisors and co-workers; and respond to work pressures. A.R., at 178-79. The ALJ incorporated these restrictions into her RFC determination as the ALJ found that plaintiff was limited to simple, routine, repetitive tasks that required only minimal interpersonal contact and were performed in a non-production setting. A.R., at 22.

Instead, it appears that the ALJ did not follow Dr. Padgett's conclusions *in toto* based on the ALJ's reasoning that Dr. Padgett's findings were not supported by his own testing or the other evidence in the record. A.R., at 21-22. While the ALJ did note Dr. Stone's conservative treatment of plaintiff rather than use of psychotropic medications, A.R., at 22, in discussing the shortcomings of Dr. Padgett's conclusions, the ALJ specifically referenced Dr. Padgett's own psychological evaluation of plaintiff. Put another way, where the ALJ found that Dr. Padgett's

conclusions were unsupported by his own clinical notes and testing, the ALJ did not defer to such conclusions.

Regardless of the alleged deficiencies in Dr. Stone's opinion, it is clear that the ALJ only used such treating source's opinion as but one factor in determining what weight to give Dr. Padgett's conclusions. The ALJ properly considered Dr. Padgett's opinions.

### b. Whether Dr. Padgett's Opinion is Entitled to Greater Weight in Accordance with Regulations

As a subcontention, plaintiff argues that the ALJ had no basis for rejecting Dr. Padgett's assessment because the opinion meets the standards set out in 20 C.F.R. § 404.1527(d). Pursuant to the factors in § 404.1527(d), however, the weight that the ALJ attached to Dr. Padgett's opinion was proper as Dr. Padgett only examined plaintiff once, he had no treatment relationship with her, and his conclusions were not consistent with his own findings or the other medical evidence in the record. Section 404.1527(d) provides, as follows:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.
>
> (ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has

treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527(d). In this district, it is clear that where a doctor's opinion is not given controlling weight under Subsection (d)(2), then

the "factors listed below" and in paragraphs (d)(3) through (5) used to determine the amount of weight to be given it are (1) the length of the treatment relationship and the frequency of examination ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"); (2) the nature and extent of the treatment relationship; (3) supportability ("the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"); (4) consistency ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"); and (5) specialization ("[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"). Id. The regulation also makes clear, however, that the ultimate determination of disability is reserved for the Commissioner, and "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 416.927(e)(1).

Pittman v. Massanari 141 F.Supp.2d 601, 608 (W.D.N.C. 2001)(Horn, C.M.J.). Not only did Dr. Padgett's opinion suffer from the brevity of the physician-patient relationship, his opinion was simply unsupported by his own objective findings and inconsistent with other medical evidence of record.

### E. Conclusion

The undersigned has carefully reviewed the decision of the ALJ, the transcript of proceedings, plaintiff's motion and brief, the Commissioner's responsive pleading, and plaintiff's assignments of error. Review of the entire record reveals that the decision of the ALJ is supported by substantial evidence. See Richardson v. Perales,

supra; Hays v. Sullivan, supra. Finding that there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Richardson v. Perales, supra, the undersigned will deny plaintiff's Motion for Summary Judgment, grant the Commissioner's Motion for Summary Judgment, and, therefore, affirm the decision of the Commissioner.

Signed: May 26, 2006

Dennis L. Howell
United States Magistrate Judge